RENDERED:  NOVEMBER 19, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0340-ME

JAMES CHRISTOPHER SEWELL            APPELLANT

               APPEAL FROM LEWIS FAMILY COURT
v.             HONORABLE JEFFREY L. PRESTON, JUDGE
               ACTION NO. 20-D-00030-001

ELIZABETH INGRID SWEET            APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, COMBS, AND MAZE, JUDGES.

MAZE, JUDGE:  Respondent-Appellant James Christopher Sewell appeals from a judgment of the Lewis Family Court upholding the interpersonal protective order ("IPO") issued against him in favor of Petitioner-Appellee, Elizabeth Ingrid Sweet. We conclude the family court did not violate Sewell's due process rights, nor did the family court abuse its discretion in granting an IPO in Sweet's favor.

## BACKGROUND

The dating relationship between Sewell and Sweet began in May 2018. Despite conflicting testimony about the length of the relationship, the parties engaged in behavior indicative of a relationship through May 2020. On August 20, 2020, Sweet filed a petition for an emergency protective order against Sewell. Sweet alleged the following two instances in her petition for the IPO:

> [O]n May 27, 2020, in Lewis County, Kentucky, . . . Respondent [Sewell] came to Petitioner's [Sweet's] residence between 11:00 p.m. and 12:00 a.m. The Respondent beat on the petitioner's door and side of the residence. When the Petitioner opened the door, the Respondent came into the residence and wanted to know where the Petitioner had been and who she had been with. The Respondent left after the Petitioner stated she was calling the police.
>
> The Respondent came to the Petitioner's workplace in fall of 2019 to confront the Petitioner about their relationship.
>
> The Respondent continues to attempt to communicate with the Petitioner after the Petitioner stated to him repeatedly to stop communicating with her.

Based on the allegations in the petition, the family court issued a temporary IPO entered on August 20, 2020. Thereafter, the family court held a hearing on August 27, 2020. Sweet testified to the first instance cited in her petition, explaining that Sewell had arrived at her residence late at night, and began banging on her door until she woke up and let him in. Sweet then testified that she

-2-

filed the petition after a series of stalking events, including an event when Sewell followed her around a walking track at the Lions Club Park. This incident was not cited in the petition.

Next, Sweet testified to a past instance of domestic violence which took place in the Spring of 2019. This instance was not included in the petition. Sweet testified that Sewell, without provocation, grabbed an arrow and stabbed at her, stopping inches away from her chest, while his minor child was in the room. Sewell testified that the arrow incident never happened and that he would never act in a way to scare his daughter, intentionally or otherwise. Sewell further testified that he had phone records and text messages as well as character witnesses he intended to introduce. The family court continued the hearing specifically to allow Sewell time to amass witnesses and exhibits.

At the second hearing on January 28, 2021, Sweet testified again to the first of the two events alleged in the petition which occurred on or about May 27, 2020. Sweet awoke to the sound of knocking at the door around 11:00 p.m. Sweet alleges Sewell grabbed her arm pushed his way into the house and began questioning her about her whereabouts. Sweet contends that Sewell was in her home for about thirty minutes and did not enter the home beyond that of the laundry room. Sewell states this event did not happen because on the date alleged,

he had his daughter. Sewell claims two photographs were provided with metadata to confirm he was with his daughter during the time of this event.

Sweet next testified to the second instance cited in the petition where Sewell came to her place of employment while they were dating in 2019. Sewell explained that he arrived a day early from a trip out of town to surprise Sweet on Thursday. When Sewell arrived at Sweet's home that evening to give her flowers, she was not home. Sewell attempted to contact her, but the call went straight to voicemail. On Monday afternoon, Sewell went to Sweet's office. Sewell testified that he has been to her office on numerous occasions. They walked outside and discussed their relationship for about ten minutes.

Sweet continued her testimony by again recounting the alleged arrow incident in the Spring of 2019. Next, Sweet testified to an incident that occurred in the Fall/Winter of 2019. Sweet explained that Sewell asked her to go to his farm to feed the animals while he was in South Carolina. Sweet testified that Sewell berated her over the phone for not feeding the animals quickly enough. Sewell explained during his testimony that he was upset she did not feed the animals earlier in the day because he did not like her going to the farm at night alone. Furthermore, Sewell said he was upset on the phone call because upon his return home, he discovered that Sweet had taken her two deer mounts and had removed his mounted trophy deer from its plaque, leaving the deer in disarray on the floor.

Sweet then testified about another incident in the Fall of 2019. Sewell arrived at Sweet's house under the influence of alcohol. Sweet brought Sewell into her home where they began arguing and exchanging insults about each other's children. Sweet became upset, and asked Sewell to leave. There was no further argument.

Sweet then testified about an event which took place in her home on November 17, 2018. Sweet explained that Sewell put his hands around her neck and choked her. However, Sewell contends that the event never happened because he was not in Kentucky. Sewell provided two images as photographic evidence showing that he was in Ohio on an extended hunting trip with friends during the time the choking event was alleged to have happened. The first photograph is a screenshot of a video taken on November 16, 2018, at 12:02 p.m. in Aberdeen, Ohio. The second photograph was taken on November 18, 2018, at 12:14 p.m. in West Union, Ohio. The dates and times of the photographs were displayed by the automated timestamp provided when taking a picture using an iPhone. In her testimony, Sweet had submitted photographs displaying bruises around her neck as evidence of the choking event.

Sweet then testified to the final incident which occurred in August 2020. Sweet contends Sewell followed her to the Lions Club Park, where she walked around the track. This is the same incident Sweet testified about at the first

hearing. Sewell also addressed this incident in his testimony, stating that he had driven to the local feed store located across the street from the Lions Club Park and noticed Sweet's vehicle parked at the track. Sewell testified he felt compelled to go over to the track where Sweet was walking because a few weeks prior, on July 11, 2020, Sweet sent Sewell a text message complaining when he did not approach or speak to her when they saw each other out in public. Sewell replied to the text message and explained to Sweet that he avoided her on that occasion because he "did not want to be disrespectful towards [Sweet] . . . or make anything worse by stopping unannounced." Sewell went over to the track where Sweet was walking. Eventually, the two stopped walking and Sewell gave Sweet a note he had previously written for her. Sweet and Sewell walked back to the parking lots and drove away in separate vehicles. This was the last time Sweet saw Sewell. Sweet testified that she filed the petition because of the track incident. However, it was not cited in her petition.

At the conclusion of the hearing, the family court took the matter under submission. On February 24, 2021, the family court entered an IPO in favor of Sweet and against Sewell, for the maximum period of three years. This appeal followed.

## STANDARD OF REVIEW

The family court's findings of fact will only be disturbed if clearly erroneous. CR[1] 52.01; *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982). A finding of fact is clearly erroneous if it is not supported by substantial evidence. *Hunter v. Hunter*, 127 S.W.3d 656, 659 (Ky. App. 2003). "Substantial evidence is evidence, when taken alone or in light of all the evidence, which has sufficient probative value to induce conviction in the mind of a reasonable person." *Id.* (citations omitted). We review questions of law *de novo*. *Id*.

In our review of an IPO, "the test is not whether we would have decided it differently, but whether the findings of the [family] judge were clearly erroneous or that he abused his discretion." *Cherry*, 634 S.W.2d at 425 (citation omitted). "Abuse of discretion occurs when a court's decision is unreasonable, unfair, arbitrary or capricious." *Castle v. Castle*, 567 S.W.3d 908, 915 (Ky. App. 2019) (citation omitted). "[W]e give much deference to a decision by the family court, but we cannot countenance actions that are arbitrary, capricious or unreasonable." *Id.* at 916 (citation omitted).

---

[1] Kentucky Rules of Civil Procedure.

ANALYSIS

On appeal, Sewell urges this Court to reverse the family court's entry of the IPO for two reasons. First, Sewell claims that the family court abused its discretion and violated his due process rights by allowing Sweet to testify to events during the hearing that were not included in the filed petition. Second, Sewell contends that the family court erred in finding acts of dating violence and stalking occurred and may occur again.

## I. Violation of Procedural Due Process Rights

Sewell contends that his constitutional right of due process was violated when the lower court allowed Sweet to testify to prior alleged domestic violence that was not pled in the petition. Sewell argues that he was unable to effectively prepare for the hearing because he was not provided adequate notice of the basis of the petition.

Sewell maintains that, pursuant to KRS[2] 403.725(3)(c), domestic violence petitions shall contain "the facts and circumstances which constitute the basis for the petition alleging domestic violence and abuse." Thus, Sewell reasons that he was inadequately notified of the petition's basis because Sweet testified to domestic violence events that were not included in the domestic violence petition. However, Sewell fails to point to any Kentucky authority requiring an individual to

---

[2] Kentucky Revised Statutes.

list every alleged domestic violence act in the petition for a domestic violence order, nor can we find any.

Our courts have held that a DVO "cannot be granted solely on the basis of the contents of the petition." *Hawkins v. Jones*, 555 S.W.3d 459, 461-62 (Ky. App. 2018) (citation omitted). Additionally, this Court has held that "[d]ue process requires, at the minimum, that each party be given a meaningful opportunity to be heard." *Lynch v. Lynch*, 737 S.W.2d 184, 186 (Ky. App. 1987). Therefore, Sweet's testimony is not restricted to only those alleged events in a DVO petition, as both parties are required to have an opportunity to be heard.

Furthermore, Sewell was allotted two meaningful opportunities to present testimony and evidence in his defense. In fact, the family court specifically continued the first hearing to grant Sewell additional time to gather witnesses and evidence because he alleged he did not have sufficient time or notice to refute Sweet's allegations. Thereafter, Sewell had five months between the first hearing and the second hearing to compile his witnesses and evidence to challenge Sweet's allegations made at the first hearing. Thus, his due process rights were not violated.

## II. Insufficient Facts to Support Findings of Domestic Violence and Stalking

In granting the IPO for Sweet, the family court made the finding that domestic violence and abuse and stalking had occurred and may occur again.

-9-

However, Sewell argues there were insufficient facts to warrant the family court's findings. While we agree with Sewell that there was insufficient evidence to support the finding of stalking, we conclude that there was substantial evidence to support the family court's finding that dating violence and abuse had occurred and may again occur.

Pursuant to KRS 456.060(1), a court may issue an IPO if it finds "by a preponderance of the evidence that dating violence and abuse, sexual assault, or stalking has occurred and may again occur[.]" KRS 456.010(2) defines "dating violence and abuse" as "physical injury, serious physical injury, stalking, sexual assault, strangulation, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault occurring between persons who are or have been in a dating relationship[.]" Therefore, a petitioner for an IPO based upon dating violence or abuse need only show either (1) physical injury, serious physical injury, stalking, sexual assault, strangulation *or* (2) fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault occurring between persons who are or have been in a dating relationship, *and* that such violence or abuse may again occur.[3] In the alternative, a court may grant an IPO based upon a finding that either sexual abuse or stalking occurred.

---

[3] KRS 456.010(2).

-10-

In its role as factfinder, the trial court may necessarily have to consider the credibility of each witness. *Bissell v. Baumgardner*, 236 S.W.3d 24, 29 (Ky. App. 2007). The "trier of fact has the right to believe the evidence presented by one litigant in preference to another. . . . [and] may believe any witness in whole or in part. The trier of fact may take into consideration all the circumstances of the case, including the credibility of the witness." *Id.* at 29-30 (citation omitted). On appeal, we are mindful of the trial court's opportunity to assess the credibility of each witness, and as such, we would only alter the court's findings if they were clearly erroneous. CR 52.01; *Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky. 1986).

The family court found that Sewell's conduct amounted to acts of stalking. KRS 456.010(7) incorporates the definition of "stalking" as set forth in KRS 508.140 or 508.150. As applied to the current case, the family court must consider whether the elements of second-degree stalking pursuant to KRS 508.150(1) were met:

> A person is guilty of stalking in the second degree when he intentionally:
>
> (a) Stalks another person; and
>
> (b) Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:
>
> > 1. Sexual contact as defined in KRS 510.010;

2. Physical injury; or

3. Death.

KRS 508.130 defines the term "stalk" as follows:

(1) (a) To "stalk" means to engage in an intentional course of conduct:

    1. Directed at a specific person or persons;

    2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and

    3. Which serves no legitimate purpose.

    (b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental distress.

(2) "Course of conduct" means a pattern of conduct composed of two (2) or more acts, evidencing a continuity of purpose.

In granting the IPO, the family court concluded that the actions described in the petition met the definition of "stalk" as defined in KRS 508.130. The petition satisfied the adequate course of conduct because it alleges at least two instances of conduct directed towards Sweet which seriously alarmed, annoyed, intimidated, or harassed her without a legitimate purpose. It is reasonable that such conduct would cause Sweet to suffer substantial mental distress because she told Sewell that his communication attempts were unwelcomed.

-12-

Sewell maintains that the second instance cited in the petition is too far removed to constitute a continuation of conduct, as it occurred in 2019. However, KRS 508.130(2) requires only that at least two acts be committed to show "a continuity of purpose[,]" and a specific length of time is not required. *Jones v. Jones*, 617 S.W.3d 418, 425-26 (Ky. App. 2021). Here, Sewell clearly committed at least two acts which show a continuity of purpose.

Having met the definition of "stalk" under KRS 508.130, the Court must now address whether Sewell's conduct amounts to second-degree stalking pursuant to KRS 508.150(1). Sewell contends that his actions do not satisfy the elements of second-degree stalking because no threats, implicit or explicit, were made. Sewell points to *Kummer v. Valla*, where this Court found that the trial court erred in finding the respondent stalked the petitioner when he came to the petitioner's workplace to engage in a verbal altercation because the respondent did not make any explicit or implicit threats. No. 2018-CA-001333-ME, 2019 WL 1578801, at *4 (Ky. App. Apr. 12, 2019). Likewise, in *Caudill v. Caudill*, this Court ruled that the respondent's visiting the petitioner's workplace did not constitute domestic violence despite having been told not to. 318 S.W.3d 112 (Ky. App. 2010).

Upon thorough review of the record before us, we find insufficient evidence to support the family court's finding that Sewell stalked Sweet. Sewell

-13-

had visited Sweet's place of employment on numerous occasions throughout their relationship. While Sewell's visits to Sweet's workplace with the intent to engage in a verbal argument about the status of their relationship may have been irritating, the behavior does not amount to a threat with the intent to place that person in reasonable fear of sexual contact, physical injury, or death.

Therefore, we conclude the family court's finding that stalking occurred and is likely to occur again is not supported by substantial evidence. Nevertheless, the family court also found that Sewell's actions amounted to dating violence and abuse. The court specifically noted Sweet's fear and explanation of events were far more credible than Sewell's version of events.

Having carefully reviewed the record and both hearings, we conclude that there was sufficient evidence that acts of dating violence occurred and may occur again. The court found that on several occasions Sewell had committed acts of violence and threats of violence upon Sweet, as well as emotional abuse. The court cited numerous incidents displaying those actions which included threatening Sweet with an arrow, coming into her home without permission, choking her, and coming to her place of employment wanting to start verbal altercations. Additionally, Sweet submitted photographs of her resulting injuries as evidence to substantiate her allegations. Conversely, Sewell did not produce any evidence or witnesses to support his version of events. Therefore, the family court properly

-14-

issued an IPO because it found, by preponderance of the evidence, that dating violence occurred and is likely to occur again.

## CONCLUSION

Accordingly, we affirm the IPO entered by the Lewis Family Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

LeAnna M. Homandberg
Covington, Kentucky

BRIEF FOR APPELLEE:

R. Stephen McGinnis
Greenup, Kentucky